# No. 16,730.

## MOORE *v.* THE PEOPLE.
(243 P. [2d] 425)

Decided March 17, 1952.   Rehearing denied April 14, 1952.

Mr. Joseph D. Neff, Mr. Arthur Everett Small, Jr., for plaintiff in error.

Mr. Duke W. Dunbar, Attorney General, Mr. H. Lawrence Hinkley, Deputy, Mr. Frank A. Wachob, Assistant, for the people.

*En Banc.*

Mr. Justice Alter delivered the opinion of the court.

Clarence O. Moore was charged with the crime of embezzlement, found guilty by a jury, and sentenced to a term in the penitentiary. He is here by writ of error seeking a reversal of the judgment.

The information was filed in the district court in and for Rio Blanco County, and, upon motion of defendant, the venue was changed to Garfield County, Colorado, where, upon trial, the result was as hereinbefore indicated.

The information was based upon the provisions of section 99, chapter 48, '35 C.S.A. In substance it was therein charged that Clarence O. Moore, being an attorney at law and agent in fact of one Loper, had in his possession the sum of $309.00 belonging to Loper, which said sum defendant fraudulently and feloniously converted to his own use with intent to steal the same.

The uncontradicted evidence is substantially that prior to May, 1950, defendant represented one of the partners in an action in the district court to bring about the disso-

lution of a partnership and settlement of the indebtedness and distribution of any remaining assets. Loper had a claim against the partners in the sum of $309.00, but was not a party to the litigation and was not represented by counsel.

On March 23, 1950, the court entered its order, judgment and decree in the partnership dissolution action, and at the same time allowed Loper's claim in the sum of $309.00 to be paid out of the proceeds derived from the sale of the partnership property and subject to the payment of prior claims. The sale of the partnership property resulted in funds sufficient to discharge Loper's claim. On March 27, 1950, subsequent to the order, judgment and decree in the partnership action, defendant wrote Loper advising him of the contemplated sale, and therein stated: "I do not know when this sale will take place, but if you cannot be here at the time, I should have some authority from you to collect the above account before Martin receives his share. If you do not expect to be here kindly sign and return the enclosed power of attorney so *I can protect you in the amount of this claim.*" (Italics ours.)

Loper executed the power of attorney, and the same was filed in the district court April 26, 1950. On May 23, 1950, the clerk of the district court mailed his check for $309.00 to defendant at Craig, Colorado, where it was promptly cashed by defendant. Prior to June 10, 1950, Loper was in Rangely and unsuccessfully attempted to see defendant about his $309.00 claim against the partnership, and on June 10, 1950, defendant wrote Loper as follows: "Sorry I was away on your visit. In this partnership settlement, I have not received a copy of the final court order, which I will pick up this coming week while in Meeker. I filed the power of attorney so the settlement will go thru' my hands."

Loper made several unsuccessful attempts to contact defendant by telephone, and, in response to an inquiry made by him, the clerk of the district court, on July 21,

1950, wrote him advising that the check in settlement of his claim had been mailed to defendant on May 23, 1950. It would appear that subsequent to July 21, 1950, Loper filed a complaint and caused a warrant to issue charging defendant with embezzlement, and thereafter the information upon which defendant was tried was filed. So far as the record discloses, there was no correspondence or personal contact whatever between Loper and defendant subsequent to June 10, 1950, until the fall of that year, when defendant called on Loper in Wyoming and inquired the reason for the criminal information, but there is a complete disagreement between Loper and defendant as to other statements made at that time.

It further is admitted that prior to August, 1948, defendant represented Loper and some workmen in their effort to collect sums due them from certain individuals or a corporation engaged in development work in Rio Blanco County. The workmen assigned their claims to Loper, and defendant commenced a court action on the claims of Loper and the assigned claims of the workmen. Prior to any judgment Loper arranged a settlement of the suit by accepting in cash the amount due the workmen and taking in satisfaction of his claim a note dated August 14, 1948, in the sum of $4,600.00 secured by 200,-000 shares of the capital stock of the Empire Corporation, and thereupon the suit was dismissed. The note mentioned was prepared by defendant and included an attorney fee of $750.00, $150.00 thereof, according to his statement, was to cover the retainer fee in the action which had been dismissed, and the balance of $600.00 being an attorney fee for securing a judgment on the note in event the same was not paid at maturity. On August 31, 1948, defendant wrote Loper with reference to the action in which the note and stock was involved, stating: "In order that my records may stand straight will you be good enough to write me a letter stating you are holding the note for $4,600.00, together with stock in the Empire Corporation, and that my interest in the note

is $600.00, and a proportionate number of shares of stock in the event the note is unpaid."

On December 7, 1948, the note, together with the shares of stock, were mailed to defendant. The note secured by the stock, not having been paid at its maturity, a default judgment thereon was taken on May 5, 1949. According to the record, the stock was worthless and the judgment uncollectible, Loper having testified that he would sell the same to defendant for ten cents.

Such other evidence as we consider necessary for an understanding of our disposition of the assignments of error will be considered in connection therewith.

The assignments of error are grouped, and as presented here, are: 1. The trial judge was biased and prejudiced, preventing a fair trial. 2. Misconduct of the jury. 3. Errors of law: a. Attorneys lien. b. Dissimilar transactions. c. Cross examination. d. Defense. We will discuss them in the order named.

■ 1. Defendant is an attorney and counselor at law, with more than thirty years actual experience in the practice of the profession. His evidence on direct and cross-examination comprises more than sixty-five pages of the record. In his answers he persistently interjected hearsay testimony and incompetent, irrelevant and immaterial evidence, notwithstanding the trial judge's suggestions and rulings. It clearly appears from the record that defendant knowingly and persistently disregarded the trial judge's suggestions and trespassed upon his rulings, all of which were made without evidencing bias, prejudice or impatience. Considering the fact of defendant's long experience in court matters, the trial judge would have been justified in reprimanding him for his conduct. The assignment of error based upon the trial judge's bias and prejudice is wholly unsupported by the record.

■ 2. The trial began on March 6, 1951, and the verdict of the jury returned March 9, 1951. Defendant, in his motion for a new trial, filed April 7, 1951, sup-

ported the same by his own and two other affidavits, one of which was that of his wife and the other of a bondsman, both affiants having been in attendance during the four days of the trial. In each of the affidavits there appears a statement that during the progress of the trial the prosecuting witness was seen to converse with one or more of the jurors, and this is the basis for one of the assignments of error.

It is singular that neither defendant nor his wife, nor his bondsman considered this matter of sufficient importance to bring it to the immediate attention of the trial judge, and no mention whatever was made to the trial judge of the matter stated in the affidavits until about a month after the occurrences of which complaint is now made. The record justifies us in concluding that defendant, by reason of his long experience in trials, knew that it was his duty to direct the court's attention to any alleged misconduct on the part of the prosecuting witness and jurors—if such occurred—immediately upon observing the same; however, notwithstanding his failure to do so, he now seeks to take advantage of the situation which should have been immediately called to the court's attention. There is no statement in the affidavits inpugning any improper motive in any discussion or conversation between the prosecuting witness and jurors; no intimation that anything was said with reference to the matters then or thereafter to be brought to the attention of the jury, and under this state of the record it will not be presumed that the jurors violated the admonition of the court.

In *Beals v. Cone,* 27 Colo. 473, 62 Pac. 948, where a new trial was sought based on alleged misconduct of the jury, we said: "There is nothing in the facts established by the affidavits that the jury or any member had been tampered with, or that any effort was made in this direction. Citizens who are required to render services in the determination of disputes between litigants, should not be charged with a disregard of their duty or their oath,

nor will the courts assume that they have been guilty of such conduct, unless the facts upon which such a charge is based warrant that conclusion."

On this assignment the defendant seeks to occupy the following enviable position: If the jury returned a favorable verdict, nothing would be said; while if the verdict was unfavorable, it might afford him a sufficient ground for a new trial.

It may be stated generally that in order to constitute grounds for setting aside the verdict of a jury on account of any misconduct of the members thereof, in either a criminal or civil case, or because of any unauthorized or improper communication with them, it is incumbent upon defendant to show that he was biased or prejudiced thereby. The determination of prejudice is a matter committed to the sound discretion of the trial court, and it is only where that discretion has been abused that a new trial will be ordered. *Chestnut v. People*, 21 Colo. 512, 42 Pac. 656; *Thistle v. People*, 119 Colo. 1, 199 P. (2d) 642; *People v. White*, 365 Ill. 499, 6 N.E. (2d) 1015; *People v. Phelps*, 388 Ill. 618, 58 N.E. (2d) 615; 23 C.J.S., p. 1180, §1447; 55 A.L.R., 750; 39 Am. Jur., p. 111, §96.

The court, in ruling upon a motion for new trial, stated:

"No objection was made and here come these affidavits that say the persons who make them do not know what these people talked about the juror, don't know whether they were talking about the weather, crops or the law suit, the case on trial; they don't know. Nebulous is a mild word for that.

"True enough, the jury did not take a great deal of time in their deliberations, but the time they did take was ample and sufficient."

Assigned error based upon the misconduct of the jury is not established by the affidavits or otherwise, and no abuse of discretion appears.

■ 3.a. Here, the defense was based upon the provisions of section 14, chapter 14, '35 C.S.A., generally under

which a lien is created on any money in the hands of an attorney for any fees due or to become due from any client. This section provides for notice and concludes with the following sentence: "Such lien may be enforced by the proper civil action." *Collins v. Thuringer,* 92 Colo. 433, 21 P. (2d) 709. We therein held that there are two classes of attorneys' liens, one being general and the other special; the general lien attaches to all property coming into the attorney's possession *in the course of his professional employment.* Under this lien the attorney had a right to retain the property until any balance due him for legal services had been paid. Under the attorney's special lien we held that there was an equitable right authorizing the attorney "to be paid his fees and disbursements out of the judgment obtained as a result of his service and skill." The evidence is undisputed in the present case that defendant did not represent Loper as his attorney, but his representation was merely as attorney in fact. Under the factual situation appearing, there is here no basis upon which defendant could rightfully claim either a general or special attorney's lien; there were no funds coming into his hands in the course of his professional employment. Defendant frankly admits that his purpose in collecting the $309.00 was to protect Loper's rights, and that he never claimed it. The record shows that in 1948 three workmen had a claim against some promoters for wages due them, and they sought defendant's services in the collection thereof. At the same time, or shortly thereafter, defendant suggested that the labor claims be assigned to Loper, who likewise had a large balance due him from the same promotors, and a suit was brought in Loper's name. This action was dismissed with defendant's knowledge upon the payment of $525.00 due the workmen, and the acceptance of a note for $4600.00 secured by 200,000 shares of stock. Defendant prepared the note and included therein $750.00 attorney's fees in event of its nonpayment at maturity, and testified that the $750.00 repre-

sented a fee of $600.00 for his services in the suit on the promissory note if unpaid at maturity and $150.00 which he testified was to be his retainer in the action which had theretofore been dismissed upon the settlement indicated. Subsequently defendant wrote Loper requesting some evidence of his interest to the extent of *$600.00* in event the note was paid, and a proportionate share of the stock in event of its nonpayment. Thereafter, upon the maturity of the note, an action was brought thereon, and a default judgment was entered for the full amount thereof, including the attorney's fee. Defendant admitted that there was no fee due him from Loper on account of the $309.00 received which is the sum here involved. He testified that there were unpaid fees due him from Loper in connection with the litigation, the amount thereof being minor. He also testified that he had never rendered Loper any statement claiming unpaid fees advanced or attorney's fees. When defendant wrote Loper on March 27, 1950, he knew that Loper's claim against the partnership for $309.00 had been agreed to by counsel in the partnership accounting action; had been approved and allowed by the trial court on March 23, 1950; and would be paid Loper without question if the sum realized from the sale was sufficient. There was no necessity for a power of attorney. The power of attorney was filed in the district court on April 26, 1950; the check in payment thereof, dated May 23, 1950, was payable to the order of defendant, and was actually cashed by him on May 27, 1950. Defendant testified that he kept the $309.00 intact in his safe at Rangely until he moved to Lakewood, Colorado, and thereafter retained the moneys in his safe pending some settlement with Loper. As we have shown, at the time of the trial there was nothing due defendant from Loper except a small balance which he claimed for advanced fees and costs for, according to defendant, the retainer in the first litigation against the oil promotors, amounting to $150.00, was included in the attorney's fee stipulated in the note secured by the 200,000 shares of

stock. The shares of stock, so far as the record reveals, were delivered to defendant on December 7, 1948, and still remain in his possession. Nothing has ever been realized on the default judgment and apparently the stock securing the note upon which the default judgment is based is worthless.

The $309.00 here involved came into defendant's possession on May 27, 1950, as we have said, notwithstanding which, on June 10, 1950, defendant having been informed that Loper was inquiring about the payment, wrote Loper the letter hereinbefore set out, definitely worded so as to lead Loper, or any reasonable person, to assume that his claim had not then been paid, and, so far as the record discloses, Loper first learned of the payment in a letter dated July 21, 1950, from the clerk of the district court. Defendant testified that his only purpose in cashing the check was to hold the amount thereof until he had arranged some settlement with Loper, and this he intended to do shortly after cashing the same; however, it was not until the latter part of November, 1950, that defendant actually contacted Loper, and in the interim between cashing the check and the November meeting, no correspondence or personal contact between defendant and Loper was had.

The information was based upon the provision of section 99, chapter 48, '35 C.S.A., defining embezzlement. Therein it is provided that in a prosecution for embezzlement "it shall be no defense that such * * * agent, * * * attorney at law, or other person was entitled to a commission out of such money or property, as commission for collecting or receiving or otherwise dealing with the same for and in behalf of the owner thereof or for any other reason." We have called attention to the fact that in the transaction involving the $309.00 defendant was not acting as attorney and counselor at law, but merely as attorney in fact or agent of Loper. The sole question for the jury's determination was whether defendant had voluntarily converted to his own use Loper's $309.00

with intent to embezzle the same. If the jury had determined that defendant's withholding of the sum due Loper was not with intent to embezzle by fraudulently converting it to his own use, there would be evidence in the record to have supported that verdict. There was competent evidence justifying the jury in determining otherwise, and in the absence of any other error, the judgment and verdict will not be disturbed.

3.b. The people introduced evidence of similar financial difficulties encountered by others in connection with legal matters handled by defendant, for the purpose of proving defendant's intent in the case on trial. Such evidence is admissible. Before any evidence whatever was admitted, the court instructed the jury as follows:

"The jury is instructed at this time, or directed, rather, that in a charge of this nature, embezzlement, the intent of the defendant is a very material issue and, in fact, may well be the question of prime importance for the determination of the jury. Therefore, the Court has ruled that in this case evidence of *similar transactions* between defendant and certain other persons may be presented to the jury solely as an aid to the jury in determining the intent properly to be attributed to the defendant in the transaction upon which the information is based; the absence of mistake or accident on the part of the defendant with respect to such matters, and whether or not the same indicates any general plan, purpose or design on the part of the defendant to defraud the complaining witness, Mr. Loper. For those purposes only. This evidence of other transactions is not to be considered by the jury as any evidence of the charge asserted in the Information against the defendant, or for any purpose other than insofar as it goes either to intent, plan, design, motive or on the issue, if any, of mistake or accident. The jury is directed to regard and consider this evidence for any one or more of those purposes only, and for no other purpose whatsoever." (Italics ours.)

Following this instruction of the court, one Norman

testified that he retained defendant to make a collection for some work which he had done for an insolvent debtor who was bonded. Litigation ensued with the result that witness' claim was to be paid by the bonding company, and, accordingly, on March 2, 1949, the bonding company issued its check payable to the order of "Norman & Sons & Clarence O. Moore, his attorney" in full settlement of his claim. This check was endorsed by defendant and deposited to his credit in the bank on March 14, 1949. Thereafter and in April, 1949, the witness testified that he inquired of defendant about the payment of his claim, and defendant answered him that "It came all in one check, and he sent it back, and as soon as it was straightened out he would pay me." It is admitted that the witness made several inquiries of defendant about the payment of his claim, and on May 30, 1949, defendant issued his personal check to the witness for the amount of his claim, postdated June 1, 1949.

On cross-examination this witness, in response to questions, testified: Q. And he [defendant] settled with you satisfactorily on that claim, didn't he? A. Yes. Q. And you have no feeling that Mr. Moore is dishonest or anything of that nature, do you? A. I never thought anything about it."

Another witness testified that he had placed certain accounts in defendant's hands for collection, and after some considerable delay defendant issued a check for the amount which he claimed had been collected on the accounts, payment of which check, upon presentation to the bank, was refused.

It cannot be doubted that the testimony of both of these witnesses came strictly within the rule permitting evidence of similar transactions to prove intent, plan, design, scheme or motive of the defendant in connection with the perpetration of the crime charged in the information. The witness Norman testified, as hereinbefore noted, that defendant's services were satisfactory so that at best his evidence was not harmful to defendant, nor

did it create any prejudice whatever against him. The other witness's testimony disclosed at best a course of dealing with client's money that does not commend itself to us.

Defendant was quite ready to interject matters not responsive to questions, and, while being interrogated about his familiarity with the section of the statute under which the prosecution was proceeding, was evasive. After having been asked if the statute had been read to him, he answered: "A. Well, if you will fix a time, Mr. Delaney, perhaps I can answer you. Q. December, of 1949? A. Oh, yes, over in Craig, in Court there, *when we had a similar trial to this.* You read them to me. Q. Particularly, the portion referring to attorneys, didn't you? A. That is the one you had reference to, the criminal statute and not the civil statute?"

It was defendant himself who voluntarily and unnecessarily brought vividly to the jury's attention the fact of his involvement in transactions similar to the one for which he was then on trial.

We have carefully considered the entire testimony offered by these two witnesses and concur in the trial court's finding that the evidence was admissible, and, therefore, could not have been prejudicial to defendant.

3.c. Defendant assigns error on the court's limitation of his cross-examination of the witness Loper. It appears from the record that the cross-examination covered almost thirty pages thereof, and it clearly establishes that defendant was attempting not only to cross-examine the witness on matters brought out on direct examination, but, in addition thereto, was attempting to establish a part of his defense on such cross-examination. This the trial court refused to permit. It should be noted that under assignment 1, we took occasion to state that defendant repeatedly disregarded the trial court's rulings on objections and persisted in violating the same. It would unduly prolong this opinion to set forth the portions of the record where any restriction whatever was

placed upon defendant's right of cross examination; we content ourselves with the statement that there was no undue restriction of the valuable right of cross-examination.

3.d. Defendant's testimony on direct examination is found in thirty pages of the record and his cross-examination covers almost forty pages thereof. His only defense to the charge was a claimed attorney's lien, and it is reasonable to suppose that in his direct and cross-examination the jury could readily have understood the defense.

There were no objections to any of the instructions given the jury, and the trial judge very carefully limited the jury's consideration of similar transactions.

Defendant was represented by able counsel who were alert and diligent in protecting his every right, and properly presented his defense.

It is apparent from the verdict that the jurors believed that defendant had embezzled Loper's funds with intent to steal the same. The jury's verdict was approved by the trial court; there was ample evidence to support it, and, under these circumstances, our duty is to affirm.

Accordingly, the judgment is affirmed.

Mr. Justice Clark did not participate in the consideration of the case.